UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                          CASE NO. 8: 22 cr 256 TPB - JSS
                                            18 U.S.C. § 1035

ELISE WITHALL

## INFORMATION

The United States Attorney charges:

### COUNT ONE
### (False Statements Relating to Health Care Matters)

#### A.   Introduction

At times material to this Information:

The Defendant and Others Involved

1.      Defendant Elise Withall ("WITHALL") resided in Palm Harbor,

Florida, where she owned and operated The Withall Group LLC.

2.      Defendant LouTricia Morgan ("Morgan") resided in Sunrise, Florida.

3.      Advanced Medical Bracing LLC ("Advanced Medical") was a

Medicare-enrolled durable medical equipment ("DME") supply company that was

originally created and operated in Ohio. In or around August 2019, Articles of

Conversion were filed with the Florida Department of State, Division of

Corporations, recording that Advanced Medical's principal office address had been

relocated to Palm Harbor, Florida.

The Medicare Program

4.     The Medicare Program ("Medicare") was a federal health care benefit program that provided items and services to individuals who were (a) age 65 or older, (b) had certain disabilities, or (c) had end-stage renal disease. Individuals who received Medicare benefits were referred to as "beneficiaries."

5.     Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), which was an agency of the United States Department of Health and Human Services ("HHS").

6.     To help administer Medicare, CMS contracted with private insurance companies called "Medicare Administrative Contractors" or "MACs." MACs performed many functions, such as enrolling DME suppliers into the Medicare program and processing Medicare claims. In performing such functions, MACs were assigned to particular geographical "jurisdictions." For DME claims, they were called Jurisdictions A, B, C, and D.

7.     Medicare was made up of several component "parts" that covered different items and services. Medicare Part A, for example, covered inpatient hospital stays. Medicare Part B covered, among other items and services, outpatient care and supplies, including orthotic devices, referred to as DME (i.e., knee braces, wrist braces, and shoulder braces).

8.     Under Medicare Part B, beneficiaries could only receive Medicare-covered DME from "suppliers" that were enrolled in Medicare.

9.      Medicare claims for DME were processed by two MACs: (i) CGS Administrators, LLC ("CGS"), and (ii) Noridian Healthcare Solutions ("Noridian"). Together, CGS and Noridian are referred to herein as the "DME MACs."

*Medicare Part B Enrollment: The Form CMS-855S*

10.      A different MAC, Palmetto GBA, LLC ("Palmetto"), handled the enrollment of DME suppliers into Medicare. Palmetto was the single entity responsible for, among other duties, issuing or revoking Medicare supplier billing privileges for DME suppliers. Palmetto was also referred to as the National Supplier Clearinghouse ("NSC") MAC for DME suppliers.

11.      To enroll in Medicare Part B, a DME supplier was required to submit a completed enrollment application—meaning the "Form CMS-855S"—to Medicare. The Form CMS-855S listed many standards necessary to obtain and to retain Medicare billing privileges as a DME supplier.

12.      Pursuant to those standards, a DME supplier was required to provide complete and accurate information on the Form CMS-855S and, further, report any changes to such information to the NSC MAC within 30 days. The standards also included the following requirements:

    a.    an authorized individual (one whose signature was binding) had to sign the application for billing privileges;

    b.    a DME supplier was prohibited from direct solicitation to Medicare beneficiaries;

    c.    a DME supplier had to fill orders from its own inventory or, otherwise, was to contract with another company for the purchase of items to fill orders;

d.  a DME supplier had to maintain a staffed physical facility accessible to the public at least thirty hours per week, with visibly posted hours of operation;

e.  a DME supplier had to disclose any person having ownership, financial or control interest in the supplier DME; and

f.  a DME supplier had to be accredited by a CMS-approved accreditation organization in order to receive and retain a supplier billing number.

13.  The Form CMS-855S required applicants to disclose to Medicare any individual or organization with an ownership interest, a partnership interest, or managing control of a DME supplier. This included (i) anyone or any organization with 5% or more of an ownership stake, either direct or indirect, in the DME supplier; (ii) anyone or any organization with a partnership interest in the DME supplier, regardless of the percentage of ownership, (iii) any organization with "managing control" over the DME supplier, as well as (iv) any and all "managing employees."

14.  "Managing control" was defined on the Form CMS-855S as any organization that exercised operational or managerial control over the DME supplier, or that conducted day-to-day operations of the DME supplier. An organization did not need to have an ownership interest in the DME suppler to qualify as a managing organization.

15.  "Managing employee" was defined on the Form CMS-855S (and elsewhere) as any general manager, business manager, administrator, director, or other individual who exercised operational or managerial control over, or who,

directly or indirectly, conducted the day-to-day operations of the DME supplier. This included anyone under contract or through some other arrangement, whether or not the individual was a W-2 employee.

16.    The Form CMS-855S also called for extensive information regarding those who owned, managed, and/or controlled (financially or otherwise) the DME supplier. This information included the mandatory disclosure of "Adverse Legal Actions," which was defined to include, among other things, any federal or state felony conviction within 10 years.

17.    Finally, the Form CMS-855S required the signature of an "authorized official." The act of signing, or authorizing such signing, bound the DME supplier and official(s) to abide by all "laws, regulations, and program instructions" for Medicare. It also bound and certified the DME supplier and official(s) to the following terms, among others:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in Section 1B of this application. The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions[,] including, but not limited to, the Federal Anti-Kickback Statute, 42 U.S.C. section 1320a–7b(b)[.]
>
> ***
>
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

*DME Suppliers' Unique Identification Numbers: NPIs and PTANs*

18.     To bill Medicare, the DME supplier required two unique identification numbers: (i) a "National Provider Identifier" or "NPI," and (ii) a "Provider Transaction Access Number" or "PTAN." To issue NPIs, CMS developed the National Plan and Provider Enumeration System, which assigned NPIs to providers, including DME suppliers.

19.     For PTANs, the NSC MAC was the entity responsible for issuing such identifiers to DME suppliers, but only after approving their Forms CMS-855S. With both the PTAN and the NPI, DME suppliers could submit claims and receive payments from Medicare for braces and other equipment.

CHAMPVA

20.     The Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA") was also a federal health benefit program. CHAMPVA was a comprehensive health care program in which the VA shared the cost of covered health care services and supplies with eligible beneficiaries. CHAMPVA beneficiaries included the spouses or children of veterans who had been rated permanently and totally disabled for a service-connected disability and the surviving spouses or children of veterans who had died from VA-rated service-connected disabilities. In general, the CHAMPVA program covered most health care services and supplies that were medically necessary. CHAMPVA was always the secondary payer to Medicare and reimbursed beneficiaries for costs that Medicare did not cover. Health care claims must have first been sent to Medicare for

processing. Medicare electronically forwarded claims to CHAMPVA after Medicare had processed them. For Medicare supplemental plans, CHAMPVA processed the remaining portion of the claim after receiving Medicare's explanation of benefits.

### B.    The Charge

21.    On or about August 23, 2019, in the Middle District of Florida and elsewhere, in a matter involving a health care benefit program, that is Medicare, and in connection with the delivery of and payment for health care benefits, items, and services, the defendant,

ELISE WITHALL,

did knowingly and willfully make, and caused to be made, a materially false, fictitious, and fraudulent statement and representation to Medicare in a submitted CMS Form-855S for Advanced Medical, in that the submitted CMS Form-855S stated and represented to Medicare that LouTricia Morgan was the sole individual with an ownership interest, a partnership interest, and/or who acted as a managing employee of Advanced Medical, when in truth and in fact, as the defendant then and there well knew, LouTricia Morgan was not the sole individual with an ownership interest, a partnership interest, and/or who acted as a managing employee of Advanced Medical.

In violation of 18 U.S.C. §§ 1035 and 2.

## FORFEITURE

1. The allegations contained in Count One of this Information are realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to the provisions of 18 U.S.C. § 982(a).

2. Upon conviction of Count One, the defendant shall forfeit to the United States of America, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of the offense.

3. The property to be forfeited includes, but is not limited to, an order of forfeiture in the amount of approximately $77,915, which the defendant obtained as a result of the commission of the offense.

4. If any of the property described above, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property

under the provisions of 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1).

ROGER B. HANDBERG
United States Attorney

By: _____
Jay G. Trezevant
Assistant United States Attorney

By: _____
Tiffany E. Fields
Assistant United States Attorney

By: _____
Rachelle DesVaux Bedke
Assistant United States Attorney
Chief, Economic Crimes Section

9